**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

ODYSSEUS VENTURES LLC, GRANT DENHAM,
and DUNCAN PENN

        Plaintiffs,

        -v-

SCOTT MADISON, MEGTOR CAPITAL
PARTNERS LLC, MEGTOR CAPITAL ADVISORS
LLC, DAVID NEPO, ENERGY FUNDING
SOLUTIONS LLC, and ROY LUSTIG

        Defendants.

---------------------------------------------------------------x

Case No. _____

**COMPLAINT**

**Jury Trial Demanded**

      Plaintiffs Odysseus Ventures LLC ("Odysseus"), Grant Denham ("Denham"), and Duncan Penn ("Penn"; and together with Odysseus and Denham, "Plaintiffs"), by their undersigned counsel, as and for their Complaint against Scott Madison ("Madison"), Megtor Capital Partners LLC ("Megtor Partners"), Megtor Capital Advisors LLC ("Megtor Advisors"; and together with Megtor Partners, "Megtor"), David Nepo ("Nepo"), Energy Funding Solutions LLC ("EFS"), and Roy Lustig ("Lustig"; and together with Madison, Megtor, and Nepo, "Defendants"), allege as follows:

**PRELIMINARY STATEMENT**

      1.    This case arises from a complex, multi-party investment fraud that induced Plaintiffs—Odysseus Ventures LLC, Duncan Penn, and Grant Denham—to invest $1.5 million in what was represented as a secure, high-yield medium-term note ("MTN") issued by MTN Funding PLC. The investment was pitched as the first step in a broader financing strategy that would unlock up to $200 million in bond proceeds for Plaintiffs' real estate ventures. Instead, Plaintiffs' funds

1

were diverted, misused, and never returned.

2.    The scheme was orchestrated by Defendants Scott Madison and David Nepo, operating through multiple entities they owned and/or controlled.  Defendants falsely promised that the MTNs were fully secured, had never defaulted, and would generate reliable returns and access to institutional financing.  Plaintiffs relied on those representations, executed a series of agreements, and wired their funds in good faith.

3.    What followed was a campaign of concealment, misdirection, and breach of nearly every obligation promised.  The security Plaintiffs believed they purchased was never properly transferred; interest payments were withheld or misdirected; the MTN ultimately defaulted without any return of Plaintiffs' principal; and Madison has refused to honor the guarantee he signed to induce Plaintiffs to invest.  In the course of investigating the fraud, Plaintiffs uncovered doctored documentation, undisclosed financial arrangements, and evidence that their funds were used to pay off a personal loan tied to Nepo's condominium purchase.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiffs assert claims arising under federal law, including violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  These provisions prohibit fraud in connection with the purchase or sale of securities, which is the central issue in this case involving the misrepresentation and misuse of proceeds from a purported investment in medium-term notes.

5.    This Court also has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative facts as Plaintiffs' federal securities claims.  The common law claims—including fraud, fraudulent

inducement, breach of contract, breach of fiduciary duty, conversion, and unjust enrichment—are based on the same conduct and course of dealings that give rise to the federal causes of action.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Venue lies in any district where a defendant is found, is an inhabitant, transacts business, or where any act or transaction constituting the violation occurred. In cases involving a common fraudulent scheme by multiple defendants, venue is proper in any district where any one defendant took action in furtherance of the scheme—even if others had no direct contact with the forum.

7.      Defendant Scott Madison resides in Wainscott, New York, within the Eastern District, and operates Megtor from the same location.

8.      While in this District, Madison participated in multiple Zoom meetings in which he made material misrepresentations to Plaintiffs about the security and structure of the investment. He also created and transmitted falsified trade confirmations from this District, and negotiated and executed the Personal and Corporate Guarantee and MTN Transfer Agreement from Wainscott.

9.      Because several acts in furtherance of the fraudulent scheme occurred in this District, and Madison and Megtor reside and/or transact business here, venue is proper as to all Defendants.

## THE PARTIES

10.      Plaintiff Odysseus Ventures LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 3818 Seahorn Dr, Malibu, CA 90265.

11.      Plaintiff Grant Denham is an individual residing in the State of Florida who, along with Plaintiff Penn, owns and operates Odysseus as a managing member of the LLC.

3

12.    Plaintiff Duncan Penn is an individual residing in the State of Texas who, along with Plaintiff Denham, owns and operates Odysseus as a managing member of the LLC.

13.    Defendant Scott Madison is an individual residing in Wainscott, New York.

14.    Defendant Megtor Capital Partners LLC is a limited liability company organized under the laws of the State of New York with a principal place of business in Wainscott, New York.

15.    Defendant Megtor Capital Advisors LLC is a limited liability company organized under the laws of the State of New York with a principal place of business in Wainscott, New York.

16.    Defendant David Nepo is an individual residing in Aventura, Florida.

17.    Defendant Energy Funding Solutions LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Aventura, Florida.

18.    Defendant Roy Lustig is an individual residing in Aventura, Florida.

## FACTUAL ALLEGATIONS

**I.    Nepo and Madison's Misrepresentations and Omissions Relating to the Investment Pitch**

19.    On October 26, 2023, Plaintiffs had their first conversation with Defendant Scott Madison.  Madison held himself out to be an authorized agent of Megtor.

20.    During that October 26, 2023 discussion, Plaintiffs told Madison that they were in search of financing for real estate investments.

21.    In response, Madison presented a two-part investment structure, which he claimed would ultimately allow Plaintiffs to access between $20 million and $200 million in financing for their real estate ventures.

22.    Madison explained that the first step required Plaintiffs to purchase for $1.5 million a medium-term note (MTN) issued by MTN Funding PLC, which he represented had a par value of $1.65 million—suggesting Plaintiffs would be acquiring the MTN at a 9% discount and securing

4

an immediate $150,000 profit at purchase, which would be realized at maturity.

23.     The 9% discount was presented as a key feature of the transaction, making the MTN appear not only safe and income-generating, but immediately profitable.

24.     Madison claimed that purchasing the MTN was necessary to establish a relationship with Bedford Row Capital—the MTN's structurer—and Energy Funding Solutions (EFS), which would later issue a much larger bond offering to fund Plaintiffs' projects.

25.     During the October 26, 2023 discussion, Madison emphasized that the MTN was "100% secured," backed by stable energy assets, and guaranteed to return principal and 6.25% annual interest—even in the worst-case scenario.  He emphasized that purchasing the MTN would position Plaintiffs to access a much larger pool of capital through an upcoming bond issuance in Abu Dhabi.

26.      Madison stated that the larger bond issuance would be led by Defendant David Nepo, the head of Energy Funding Solutions, and structured through Bedford Row Capital.

27.      Madison stated that he had personally purchased $100,000 of the same MTN series and was holding it in his Interactive Brokers account. He explained that he had done so to demonstrate to other investors that the bond paid reliable coupon interest. Madison used this to further bolster confidence in the investment and offered to arrange a meeting with Nepo to explain the structure and next steps in greater detail.

28.     On October 30, 2023, Madison introduced Plaintiffs to Nepo during a Zoom meeting. Nepo presented himself as a 20-year veteran of the international bond markets and claimed he had worked extensively with Bedford Row Capital.  Nepo also stated he was Managing Member of EFS.

29.     During the October 30, 2023 discussion, Nepo held himself out to be an authorized

agent of EFS.

30.    During the October 30, 2023 discussion, Nepo represented that if Plaintiffs purchased the MTN, he would use it as the foundation to sponsor and distribute a much larger bond issuance on the Abu Dhabi Global Market.  According to Nepo, the offering would be structured by Bedford Row, issued by EFS, and sold through Nepo's global network of institutional buyers.

31.    Nepo represented that Plaintiffs' purchase of the MTN  would benefit Bedford Row Capital because Bedford needed the MTN off its books, and Plaintiffs' purchase would clear the way for EFS to structure and issue a new bond series that would provide the financing Plaintiffs were seeking.

32.    Nepo also represented that rather than charging a structuring fee for the larger bond, EFS would cover that cost by using the initial MTN transaction as collateral to initiate the $200 million Abu Dhabi issuance.

33.    Nepo also stated that the proceeds of that larger issuance—anywhere from $20 million to $200 million—would be made available to Plaintiffs to finance their real estate acquisitions. He claimed this capital could be accessed quickly and without the need for upfront structuring costs.

34.    During the October 30, 2023 discussion, Nepo and Madison also promised that the MTN itself would generate $50,000 in semi-annual coupon payments and that the MTN was fully secured as part of a $100 million bond series that had never defaulted.

35.    Nepo and Madison represented to Plaintiffs that it was impossible for their bond to default unless the entire series failed—a scenario they insisted could not occur.

36.    On November 1, 2023, Penn, Denham, Madison, and Nepo met again by Zoom.

Nepo represented again that the bond was secure and backed by energy assets. He also stated that the investment would lead to access to $20–$200 million through the Abu Dhabi bond issuance.

37.     On November 3, 2023, another Zoom meeting was held between Penn, Denham, Madison, and Nepo. Madison and Nepo both represented again that the MTN was secured and backed by stable energy securities, that it was part of large bond series that had never defaulted over the course of several years, that in the worst-case scenario, Plaintiffs would still receive back their principal and earn 6.25% interest, and that investment would lead to access to $20–$200 million through the Abu Dhabi bond issuance.

38.     On November 15, 2023, Plaintiffs met via Zoom with Nepo, Madison, and David Marquart, a money manager who was to be involved in managing the anticipated Abu Dhabi bond proceeds.

39.     During the November 15, 2023 Zoom meeting, Nepo and Madison represented again the same claims: that the bond was secure, that interest returns and return of principal was guaranteed, and that the Abu Dhabi bond would be structured and listed with no upfront costs. They repeated that the bond would pay a fixed annual coupon of 6.25%, with a par value of $1.65 million, and that Plaintiffs would be acquiring it at a discounted purchase price of $1.5 million—91% of par. This discount, they explained, would effectively provide an immediate $150,000 profit to be realized at maturity.

40.     During the November 15, 2023 discussion, Madison and Nepo proposed that Plaintiffs Denham and Penn could fund the $1.5 million purchase through a high interest "hard money" loan. Madison and Nepo assured Denham and Penn that the MTN would reliably generate sufficient income to cover interest payments on a high-interest "hard money" loan, and that even in a worst-case scenario, they would recoup their full principal and earned interest.

41.     On November 27, 2023, Plaintiffs met via Zoom with Nepo, Madison, Marquart, and Alex Hodarkovsky, an investment advisor at Megtor.

42.     During the November 27, 2023 discussion, Nepo and Madison again represented that the MTN was secured and backed by stable energy securities, that it was part of large bond series that had never defaulted over the course of several years, that in the worst-case scenario, Plaintiffs would still receive back their principal and earn 6.25% interest, and that investment would lead to access to $20–$200 million through the Abu Dhabi bond issuance.

43.     Throughout these discussions, Nepo and Madison knowingly made false statements or made them with reckless disregard for their truth.  Among other things, they knew or should have known that the bond was not secure, that the MTNs were not performing as claimed, and that no guarantees existed for repayment or interest.

44.     Based on the representations, which Nepo and Madison repeated and reinforced over the following weeks in documents and multiple Zoom meetings, Plaintiffs agreed to proceed with the MTN purchase in reliance on the promised access to significantly greater capital, the purported reliability of the MTN, the representation that the MTN was fully secured, and the guarantee that in the worst case scenario Plaintiffs would get their principal back with interest.

45.     Madison has been barred from the securities industry by FINRA since 2021.

46.     FINRA barred Madison after he failed to provide information and documents requested by FINRA in connection with its investigation into the circumstances of his termination from Merrill Lynch.

47.     At no point in time did Madison or any of the other Defendants disclose to Plaintiffs the fact that Madison was barred by FINRA.

48.     Plaintiffs relied on these material misrepresentations and omissions in deciding to

proceed with the MTN purchase. They never would have agreed to invest $1.5 million in the bond had it not been presented as a necessary and secure gateway to the larger financing opportunity.

**II.     The Relevant Agreements and Their Breach**

**a.  Madison and Megtor's Guarantee**

49.     On November 29, 2023, Defendant Scott Madison, in both his individual capacity and as Managing Member of Megtor Partners and Megtor Advisors, executed a document titled "Personal Guarantee & Corporate Guarantee" (the "Guarantee").

50.     Madison, Megtor Partners, and Megtor Advisors are defined collectively and individually as the "Guarantors" pursuant to the Guarantee.

51.     Section 1(i) of the Guarantee provided that if Energy Funding Solutions LLC ("EFS") failed to raise at least $2,000,000 by selling additional MTN bonds under the same bond series (referred to as the "MTN Capital Bond Program"), the Guarantors—Scott Madison, Megtor Capital Partners, and Megtor Advisors—would be required to compensate Odysseus Ventures LLC either by delivering the MTN bond and its associated coupon payments or by paying a cash equivalent of $109,375.

52.     This provision served as a performance guarantee to ensure that the broader bond issuance promised by Defendants, and critical to Plaintiffs' access to future financing, would materialize.

53.     Section 1(ii) further provided that in the event the MTN purchased by Plaintiffs (MTN Funding PLC, ISIN GB00BNYNFZ53) defaulted, the Guarantors would pay Odysseus in cash the total value of the bond and the associated coupon payments, again totaling $109,375.

54.     This clause operated as a credit backstop, providing a minimum guaranteed recovery if the bond failed to pay interest or principal as promised.

55.    The Guarantee further stated in Section 3 that the Guarantors would also be liable for their own obligations ("now or later incurred") as well as payment for "any loss or damage incurred by [Odysseus] with respect to any matter covered by this Guarantee or any of the Agreement."

56.    The Guarantee was a material inducement to Plaintiffs' decision to proceed with the broader investment transaction. Plaintiffs relied on the Guarantee as a measure of security and recourse in the event the MTN or the larger capital program failed to perform as promised.

57.    Both triggering events occurred.  EFS failed to raise $2,000,000 under the MTN Capital Bond Program, and Plaintiffs never received the coupon interest payments owed to them or any of the principal at maturity.

58.    Despite demand, Madison and Megtor have refused to pay any portion of the guaranteed sum, including the $109,375 payment as well as all the losses and damages incurred by Plaintiffs related to the Guarantee and the underlying transaction.

### b. The MTN Transfer Agreement

59.    On November 30, 2023, Megtor Partners and Megtor Advisors entered into a separate "MTN Transfer Agreement" with Odysseus Ventures LLC (the "MTN Transfer Agreement").

60.    Megtor Partners and Megtor Advisors are defined as the "Transferor" in the Agreement, and Odysseus is defined as "Transferee."

61.    Under the MTN Transfer Agreement, Megtor "pledge[d] to transfer the entirety of the Transferor holding the security: MTN Funding PLC ISIN: GB00BNYNFZ53 in the amount of $1,650,000.00 through Transferors Interactive Brokers Account and will be transferred to Odysseus Ventures LLC Interactive Brokers account or like kind."

62.     MTN Funding PLC securities, ISIN GB00BNYNFZ53, has a coupon rate of 6.25% to be paid two times a year and has a maturity date of December 31, 2024. *See* https://markets.businessinsider.com/bonds/mtn_funding_plcdl-medium-term_notes_202224-bond-2024-gb00bnynfz53 (last visited April 11, 2025).

63.     Megtor "warrant[ed] and covenant[ed] . . . with regard to the contractual rights which the Transferor have transferred" that (i) "that the Transferor have the right to transfer the security," and (ii) "that the Transferor have not done or knowingly permitted any act, deed or thing by which the contractual rights can be impeached or affected in any manner."

64.     In breach of these obligations, Megtor never delivered to Plaintiffs the promised MTN Funding PLC ISIN: GB00BNYNFZ53 in the amount of $1,650,000.00.

65.     After months of delay, Megtor purported to transfer a bond with a face value of $1.6 million—$50,000 less than the promised $1.65 million,

66.     Megtor never transferred any security into Odysseus's name through any recognized clearing system.

67.     If any MTN was ever actually transferred to Plaintiffs, it was transferred in a manner that left Plaintiffs off the official bond register—effectively cutting them off from direct payment and legal enforcement.

68.     The MTN that was purportedly transferred did not match the required criteria and/or specifications of  MTN Funding PLC ISIN: GB00BNYNFZ53.   Megtor failed to disclose and/or correct material discrepancies in interest rate and maturity.

69.     When Plaintiffs raised these issues, Madison issued backdated, fabricated trade confirmations purporting to reflect the correct bond terms. Metadata revealed that Madison had created the documents himself using Microsoft Print to PDF, not through any registered broker.

70.     The entire structure of the purported transfer was engineered to give Plaintiffs the illusion of being MTN bondholders, while ensuring that they were not registered as legal holders and therefore had no enforceable rights to interest or principal repayment.

71.     This pattern became unmistakable when, following maturity of the bond on December 31, 2024, no final coupon payment or return of principal was made to Plaintiffs, and the MTN was removed from Plaintiffs' brokerage account without explanation.

72.     According to standard bond procedures, removal from the account typically reflects full repayment of principal to the legal holder of record—further confirming that Plaintiffs were never in a position to actually receive what they were promised.

### c.   The EFS/Odysseus Agreement

73.     Also on November 30, 2023, Odysseus Ventures LLC and Energy Funding Solutions LLC ("EFS"), controlled by Defendant David Nepo, executed an agreement outlining the broader transaction (the "EFS/Odysseus Agreement").

74.     The EFS/Odysseus Agreement stated that EFS intended to issue a new series under the MTN Capital Bond Program to be listed on the Abu Dhabi Global Markets Stock Exchange, based on specifications to be developed jointly with Odysseus.

75.     In consideration for EFS issuing the new series and waiving upfront fees, Odysseus agreed to cause the purchase of net $1,500,000 of MTN Funding PLC securities, ISIN GB00BNYNFZ53, with the first coupon payable in June 2024.

76.     EFS failed to issue the new bond series or facilitate any capital raise as promised, and Plaintiffs never received the access to financing that Defendants repeatedly assured would follow the initial MTN purchase.

77.     Accordingly, EFS is in material breach of the EFS/Odysseus Agreement.

### III.    The Execution of the Investment and the Misappropriation of Plaintiffs' Funds

78.    On November 30, 2023, at the urging of Defendants Madison and Nepo, Plaintiff Odysseus Capital secured a $1.5 million "hard money" loan at an extremely high 17% annual interest rate.

79.    Madison and Nepo had represented that the loan could be repaid from the MTN's guaranteed coupon payments and the return of principal, which they claimed was fully secured. Plaintiffs were also told they would be purchasing a bond with a face (par) value of $1.65 million—91% of par—thereby securing an immediate $150,000 gain, which would be realized at maturity.

80.    Plaintiffs undertook this substantial financial burden in reliance on Defendants' representations that the MTN purchase was not only a safe, interest-generating investment, but also a critical prerequisite for accessing a much larger round of financing—between $20 million and $200 million—through a future bond issuance on the Abu Dhabi Global Market.

81.    Defendants presented this two-step structure as a unique opportunity: Plaintiffs would first acquire a secured position in a Bedford Row–structured MTN, and in doing so, unlock significantly greater access to capital through EFS and its international bond distribution platform. Based on these assurances, Plaintiffs moved forward with the loan and MTN purchase, believing the high cost of capital would be temporary and far outweighed by the returns and access to funding that Madison and Nepo promised.

82.    Since that time, Plaintiffs have paid off the $1.5 million loan in full—along with more than $270,000 in interest payments.

83.    In further reliance on Defendants' misrepresentations, and specifically at Madison's direction, Odysseus opened an Interactive Brokers account (No. U134094XX) to

facilitate the purchase and transfer of the MTN.

84.     On December 1, 2023, pursuant to Madison's instructions, Plaintiffs' lender wired $1.5 million directly to Megtor Partners' Interactive Brokers account (No. U104354XX), which Madison controlled.

85.     Madison represented that these funds would be used to purchase a specific bond: MTN Funding PLC, 6.25% interest, due December 31, 2024, with ISIN GB00BNYNFZ53.

86.     Madison and Nepo told Plaintiffs this was a secure bond backed by stable energy assets, and its acquisition was the necessary first step to trigger the much larger Abu Dhabi financing.

87.     On December 4 and 5, 2023, Madison submitted trade instructions to Interactive Brokers to place an order to buy MTN Funding PLC 6.25% due 12/31/2024 face amount $1,649,000 at a price of $91.00 for a cost of $1,500,590, to be executed through Megtor's Interactive Brokers account.

88.     However, the trade was never executed.  Instead, Madison claimed that Interactive Brokers was uncooperative and that a different platform would be required to complete the purchase.  He provided no valid explanation for the change.

89.     This maneuver set the stage for Madison to steer the transaction to Trade Bridge Capital—a lesser-known introducing broker where, upon information and belief, oversight and transparency would be minimal.

90.     On December 8, 2023, Madison instructed Plaintiffs to open a new brokerage account with Trade Bridge Capital, an introducing broker clearing through Savile Capital Group and StoneX.

91.     Madison claimed this account would be used for Megtor to transfer the bond into

Odysseus's name.

92.    Trade Bridge accepted the trade and related instructions despite clear red flags and helped Madison create the illusion that the MTN had been properly purchased and transferred.

93.    On December 13, 2023, instead of completing the purchase of the agreed-upon bond, Madison purported to execute an order for a security with different terms: MTN Funding PLC, 3.5% interest, maturing October 22, 2028, with a face value of $1.6 million—$50,000 less than the promised $1.65 million par value.  These improper terms cut directly into Plaintiffs' expected profits on the MTN and contradicted the terms represented throughout the transaction.

94.    Plaintiffs were not informed of the change and continued to believe Megtor had purchased on their behalf the original 6.25% MTN with a face value of $1.65 million and a 2024 maturity.  It was only later—after repeatedly demanding documentation from Madison—that Plaintiffs learned of the discrepancies.

95.    After the substitute bond was transferred into Megtor's Trade Bridge account, Madison did not even purport to transfer the bond to Plaintiffs for several months.

96.    Throughout December, including via text on December 21, 2023, Madison repeatedly assured Plaintiffs that the MTN was being held and "seasoning" in Madison's own Trade Bridge account to improve its margin profile, and that transfer was imminent.

97.    On December 28, 2023, a new account at StoneX, an affiliate of Savile Capital Group and Trade Bridge (No. 539904XX) was opened for Odysseus to receive the bond.

98.    That same day, Plaintiffs asked Madison to complete the transfer of the MTN to Odysseus Capital's account.

99.    In response, Madison claimed the transfer was "with compliance," and warned

them not to send any written instructions to the broker, stating: "We can't email [Trade Bridge] saying transfer the bond because it's going to cause a compliance issue. We will take care of it."

100.    This strategy, coordinated with Madison and Nepo, delayed whatever transfer took place, if any, for months and enabled the misappropriation of bond payments and investment proceeds.

101.    By January 2024, Plaintiffs believed—based on Scott Madison's representations—that they were the rightful owners of the MTN as of December 13, 2023, the date Madison claimed the bond was purchased through Megtor's Trade Bridge account.

102.    On January 3, 2024, the issuer of the MTN paid a $50,000 interest coupon for 2023 to Megtor Capital, not Odysseus. This payment was meant for the bondholder of record, and its receipt by Megtor, rather than Plaintiffs, indicated that the MTN had not in fact been transferred into Odysseus's name as represented.

103.    When confronted, Madison claimed that Megtor retained the $50,000 coupon payment as reimbursement for an alleged $44,736 payment of accrued interest at the time of the bond's purchase. This was the first time Plaintiffs were told that any accrued interest had been paid, and Madison never disclosed—prior to or after the transaction—that any portion of the bond proceeds would be withheld for that purpose.

104.    Even assuming there was a legitimate basis for the $44,736 reimbursement, Madison had no justification for Megtor retaining the remaining $5,264. Upon reviewing Megtor's brokerage statements, Plaintiffs discovered that Megtor retained the full $50,000 interest coupon payment, including the unexplained $5,264.

105.    After months of delay, Megtor purported to transfer the MTN into Odysseus's StoneX account on or around March 20, 2024, as reflected in Odysseus's account statements

from StoneX.

106.    On May 7, 2024, following repeated inquiries from Plaintiffs, Madison provided Plaintiffs with two amended trade confirmations purporting to reflect the agreed-upon 6.25% interest rate and 2024 maturity.

107.    Metadata analysis revealed the documents were created by Madison himself using Microsoft Print to PDF, included no embedded fonts, and were not authentic confirmations from any registered broker.

108.    Beginning in June 2024, Plaintiffs contacted Truva Corp—the trustee for the MTN series—for assistance confirming their ownership. Truva advised that neither Odysseus nor StoneX appeared as legal holders on the bond register maintained by Avenir, the official registrar.

109.    Truva further explained that all legitimate noteholders must appear on the register, and that any payment of interest or principal would only be made to a registered noteholder or their identifiable nominee.

110.    StoneX, despite repeated requests from both Plaintiffs and Truva, failed to produce the documentation Truva requested.

111.    The coupon payment due on July 3, 2024, was never received by Plaintiffs.

112.    Truva had informed Plaintiffs of a potential brief delay for the coupon payment . However, on September 27, 2024, Odysseus received only a partial payment of $29,000—well short of the expected $50,000.  No explanation was provided.

## IV.    Maturity and Default

113.    The MTN reached maturity on December 31, 2024. Plaintiffs received neither the final coupon payment nor the return of the principal on the MTN.

114.    By January 3, 2025, no funds had been received by Plaintiffs, and on January 31, 2025, the bond was removed from Odysseus' brokerage account.

115.    Based on standard industry practice and communications with the trustee, Plaintiffs allege that the removal of the bond indicates it was paid off at maturity—but that repayment was made to a different party.  Plaintiffs received nothing.

116.    Upon information and belief, Defendants structured the MTN transaction to give the false appearance that Plaintiffs were legitimate bondholders with enforceable rights, when in fact the custody arrangement and registration structure were designed to keep Plaintiffs off the official register and deny them the ability to enforce repayment of principal or interest.

117.    Defendants have failed to honor their obligations.

118.    Instead of making Plaintiffs whole, Nepo proposed rolling the investment into a new four-year MTN.

119.    In doing so, Nepo is attempting to further lull Plaintiffs from uncovering the fraud, delay litigation and allow the statute of limitations to run. Defendants' pattern of delay, concealment, lulling, and misdirection left Plaintiffs without the promised returns, interest, or transparency.

## V.    Plaintiff's Investigation and Lustig's Role

120.    In the course of investigating their claims, Plaintiffs obtained a copy of a $2.4 million promissory note executed by Energy Funding Solutions LLC ("EFS") in favor of MTN Funding PLC, dated December 14, 2023. This document was never disclosed to Plaintiffs prior to their investment and directly contradicts the representations Defendants made about the nature and purpose of the MTN transaction.

121.    According to the promissory note, MTN Funding PLC had made $2.4 million

available to EFS on the date of the note, and EFS agreed to repay that amount with 7.25% annual interest.

122.    The timing of the note is critical: Plaintiffs wired $1.5 million to Megtor's bank account on December 1, 2023, based on Defendants' representations that the funds would be used to acquire a specific secured MTN.  On December 13, 2023, Megtor purported to use those funds to execute a bond purchase from MTN Funding PLC through Megtor's Trade Bridge brokerage account.

123.    Just one day later, on December 14, 2023, the $2.4 million promissory note was executed.

124.    This sequence strongly suggests that Plaintiffs' investment was not used to purchase an MTN for their benefit, but was instead redirected to facilitate the $2.4 million promissory note.

125.    The promissory note identifies the attorney escrow account of Roy R. Lustig as the designated payee account to accept the funds on behalf of EFS. Specifically, the note instructed that the $2.4 million be sent to Lustig's IOTA Trust Account.

126.    These details suggest that Plaintiffs' investment funds—represented as purchasing a secure MTN—were in fact redirected to fund a loan from MTN Funding PLC to EFS, using Lustig's attorney trust account as an intermediary.

127.    Plaintiffs never consented to this use of their funds, nor were they informed that their money would be used to fund a promissory note in favor of Nepo's company.

128.    Upon information and belief, Lustig's IOTA trust account was used to route funds from a bond transaction that Plaintiffs had funded.

129.    Upon information and belief, Lustig knowingly facilitated the fraudulent scheme or, at a minimum, recklessly enabled it.

130.    As the holder of the IOTA account, upon information and belief, Lustig controlled Plaintiffs' funds.

131.    Despite being a licensed attorney and fiduciary, Lustig made no disclosures to Plaintiffs, never confirmed their consent, and provided no transparency into the transfer or use of their funds.

132.    Upon information and belief, Plaintiffs' funds were misappropriated to support an undisclosed financing arrangement between EFS and MTN Funding PLC—one from which Nepo personally stood to benefit.

133.    Plaintiffs never consented to this use of their money and were never informed that their $1.5 million would be routed through Lustig's IOTA account to finance a loan in favor of EFS.

## VI.    Defendants' Scienter

134.    Defendants Scott Madison, David Nepo, Megtor Partners, Megtor Advisors, and EFS acted with scienter. Each Defendant knew, or was reckless in not knowing, that their material representations to Plaintiffs were false at the time they were made and that the transaction structure deprived Plaintiffs of the enforceable rights they were promised.

135.    Madison knew that he had been barred by FINRA from the securities industry since 2021. He did not disclose that fact to Plaintiffs and instead held himself out as a licensed professional operating through Megtor. His omission was intentional and calculated to induce investment.

136.    Madison also personally fabricated trade confirmations in May 2024 to cover up the discrepancies between the promised MTN and what was actually delivered. Metadata analysis confirmed the documents were created using Microsoft Print to PDF and were not authentic

confirmations from any registered broker. This conduct evidences deliberate intent to deceive.

137.    Nepo similarly acted with scienter. He repeatedly claimed the MTN was "100% secured," part of a reliable bond series that had never defaulted, and that its purchase would unlock up to $200 million in real estate financing through a forthcoming Abu Dhabi bond issuance. These statements were knowingly false. EFS's own promissory note—executed and signed by Nepo on December 14, 2023—explicitly stated that the underlying bond was "not secured."

138.    Nepo further concealed the existence of the promissory note, and the fact that EFS had received the full benefit of the MTN investment proceeds. He directed that all payments related to the note be sent to the IOTA trust account of Roy Lustig, his personal attorney, and those funds were later used to pay off a $1.5 million loan tied to Nepo's personal real estate purchase.

139.    Both Madison and Nepo also knew that the bond structure failed to give Plaintiffs enforceable rights. They continued to represent otherwise, coordinating delays, redirections, and falsified documentation to hide the truth and lull Plaintiffs into believing their bond had been properly transferred and secured.

## VII.    The MTN Investment Is a Security

140.    The $1.5 million MTN transaction marketed and sold to Plaintiffs constitutes a "security" within the meaning of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

141.    Plaintiffs invested capital with the expectation of profits derived solely from the efforts of others—specifically, Madison, Nepo, EFS, and Megtor—who claimed they would structure and execute both the MTN placement and a subsequent $200 million bond issuance on the Abu Dhabi Global Market.

142.    Plaintiffs were promised a fixed return (6.25% interest) and full repayment of

principal.  Plaintiffs received neither.  Nor did Plaintiffs play an active role in managing the bond.

143.    Instead of playing an active role in managing the bond, Plaintiffs relied entirely on the Defendants' representations and control of the underlying transactions.

144.    The MTN investment was marketed as a fixed-income security listed on the Frankfurt exchange, backed by other securities, and integrated into a broader bond program.

145.    This marketing squarely placed the transaction within the scope of federal securities laws.

146.    Accordingly, Plaintiffs' investment satisfies the definition of an "investment contract" as interpreted under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and other applicable precedents.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## FRAUD IN VIOLATION OF SECTION 10(b)
## OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5
### (Against Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS)

147.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

148.    The MTN investment offered and sold to Plaintiffs constitutes a security under federal law.

149.    Between October and December 2023, Defendants Madison, Megtor, Nepo, and EFS made material misstatements and omissions to Plaintiffs in connection with the offer and sale of the MTN security, through Zoom meetings, phone calls, text messages, emails, written agreements, and other communications.

150.    Defendants falsely represented to Plaintiffs that they would be purchasing a fully

secured MTN issued by MTN Funding PLC, backed by stable energy assets, paying 6.25% annual interest with semiannual coupon payments of $50,000, with a face value of $1.65 million, and maturing in December 2024. They further represented that the transaction would qualify Plaintiffs for a $200 million bond issuance in Abu Dhabi, the proceeds of which would be allocated to Plaintiffs for real estate projects.

151.    These statements were false. Plaintiffs' investment was never used to acquire the promised bond through a legitimate transfer. Instead, Defendants structured the transaction to create the appearance of ownership—while knowingly preventing Plaintiffs from being registered as legal holders and denying them the ability to enforce repayment.

152.    Defendants failed to disclose that: (i) Madison had been barred by FINRA; (ii) the bond purchased for Plaintiffs had a $1.6 million face value—not the $1.65 million promised; (iii) Plaintiffs' names were never added to the bond register maintained by Avenir; and (iv) the investment was diverted to support an undisclosed $2.4 million loan from MTN Funding PLC to EFS.

153.    Specifically, on December 14, 2023—only two weeks after Plaintiffs' funds were wired, and only a day after Megtor purported to use those funds to execute the MTN purchase—EFS issued a $2.4 million unsecured promissory note to MTN Funding PLC. The note provided for 7.25% interest and directed that payments be made to the IOTA trust account of attorney Roy R. Lustig. The existence of this note was never disclosed to Plaintiffs. Nor were Plaintiffs informed that their funds would be used to finance that loan.

154.    When Plaintiffs later discovered discrepancies in bond terms and demanded documentation, Madison fabricated altered trade confirmations in May 2024 to conceal the truth. Nepo, meanwhile, concealed the existence of the EFS promissory note and misrepresented the

source and use of the MTN investment proceeds.

155.    Both Madison and Nepo made these false representations knowingly.

156.    Madison made those false representations in his capacity as a representative of Megtor Partners and Megtor Advisors, whereas Nepo made those false representations in his capacity as a representative of EFS.

157.    Plaintiffs reasonably relied on Defendants' representations in choosing to invest $1.5 million and in taking out a high-interest loan to fund the investment. They believed they were secured MTN holders with enforceable rights and access to further financing.

158.    In fact, Plaintiffs were never registered as legal noteholders, did not receive the bond they were promised, and were structurally denied the ability to recover interest or principal. As of the bond's maturity on December 31, 2024, Plaintiffs received no final payment, and the bond was removed from their account—indicating full repayment to another holder.

159.    Defendants' conduct violates Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder

160.    Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CAUSE OF ACTION

### COMMON LAW FRAUD
**(Against Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS)**

161.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

162.    Defendants Madison and Nepo knowingly made false representations concerning the structure, purpose, and protections of the MTN investment. They represented that Plaintiffs

would receive a secured bond backed by stable energy assets, paying 6.25% annual interest on a face value of $1.65 million, maturing in December 2024, and that the investment would unlock access to up to $200 million in financing from a forthcoming EFS-led issuance on the Abu Dhabi Global Market.

163.    Madison made those false representations in his capacity as a representative of Megtor Partners and Megtor Advisors, whereas Nepo made those false representations in his capacity as a representative of EFS.

164.    These statements were made in conversations and meetings held between October and December 2023, in written contracts, and in other communications. They were false when made and intended to induce Plaintiffs to invest.

165.    Defendants also failed to disclose material facts, including that Madison had been barred by FINRA, that the bond purchased had a reduced face value of $1.6 million, that Plaintiffs would not be listed on the bond register, and that their investment would be diverted to finance a separate undisclosed loan from EFS to MTN Funding PLC, for which neither the loan nor its use of funds was disclosed.

166.    In addition, Defendants falsely represented that the bond was properly held for Plaintiffs and fabricated altered trade confirmations to conceal the discrepancies in the bond's terms and their failure to ensure proper registration or transfer.

167.    These misrepresentations and omissions were made to induce Plaintiffs to invest and prevent them from discovering the true structure and purpose of the transaction.

168.    Plaintiffs reasonably relied on these falsehoods in investing $1.5 million and incurring $270,000 in financing costs. They believed they were acquiring a legitimate, secure bond investment and that their funds would be used for that purpose—not misdirected into an unrelated

financing arrangement.

169.    As a result, Plaintiffs suffered damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

170.    Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### THIRD CAUSE OF ACTION

### FRAUDULENT INDUCEMENT
**(Against Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS)**

171.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

172.    Defendants made knowingly false statements for the purpose of inducing Plaintiffs to enter into the Personal & Corporate Guarantee, the MTN Transfer Agreement, and the EFS/Odysseus Agreement, and to wire $1.5 million in investment funds.

173.    These inducements included false assurances that the MTNs were secure, that the notes had never defaulted, that Plaintiffs would receive repayment and guaranteed interest, and that the investment would enable a $200 million Abu Dhabi bond issuance through which Plaintiffs would receive access to substantial capital.

174.    These statements were made repeatedly between October and December 2023 and were designed to persuade Plaintiffs to execute the agreements and transfer funds.

175.    Plaintiffs justifiably relied on these representations in proceeding with entering into the agreements and executing the transaction.

176.    Plaintiffs were injured as a result of this fraudulent inducement, suffering damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, loss of access to the promised capital raises, and their contractual rights under the agreements.

177.    Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT – GUARANTEE
**(Against Defendants Madison, Megtor Partners, and Megtor Advisors)**

178.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

179.    On November 29, 2023, Madison, individually and on behalf of Megtor Capital Advisors LLC and Megtor Capital Partners LLC, executed a "Personal Guarantee & Corporate Guarantee" in favor of Plaintiff Odysseus Ventures LLC (the "Guarantee").

180.    Under the Guarantee, Defendants Madison and Megtor agreed to pay $109,375 to Odysseus in the event that EFS failed to raise $2,000,000 or if the MTN Funding PLC ISIN: GB00BNYNFZ53 defaulted.

181.    The Guarantee further stated in Section 3 that the guarantors would also be liable for their own obligations ("now or later incurred") as well as payment for "any loss or damage incurred by [Odysseus] with respect to any matter covered by this Guarantee or any of the Agreement."

182.    Both triggering conditions occurred: EFS failed to raise $2,000,000, and the MTN

reached maturity on December 31, 2024, without repayment of principal or the final coupon payment. The bond was subsequently removed from Odysseus's account in January 2025 without explanation or remittance.

183.    The nonpayment of principal reflects that Plaintiffs were not recognized as bondholders entitled to repayment, further confirming that the transaction was never structured to provide Plaintiffs with enforceable rights and that the Guarantee was essential to mitigate exactly this kind of loss

184.    Plaintiffs made demand on Defendants Madison, Megtor Partners, and Megtor Advisors for payment under the Guarantee on multiple occasions. Defendants refused.

185.    As a result of Defendants Madison, Megtor Partners, and Megtor Advisors' breach of the Guarantee, Plaintiffs have suffered damages, including the failed payment in the amount of $109,375, loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

186.    Defendants Madison, Megtor Partners, and Megtor Advisors are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## FIFTH CAUSE OF ACTION

### BREACH OF CONTRACT – MTN TRANSFER AGREEMENT
### (Against Defendants Megtor Partners and Megtor Advisors)

187.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

188.    On November 30, 2023, Megtor Capital Partners LLC entered into a binding "MTN

Transfer Agreement" with Plaintiff Odysseus Ventures LLC.

189.    Under the agreement, Megtor agreed to transfer a specific bond with ISIN GB00BNYNFZ53, a 6.25% interest rate, $1.65 million face value, and a maturity date of December 31, 2024.

190.    Megtor represented it had full authority to transfer the purchased bond and that no impairment affected its ability to do so.

191.    In reality, Megtor caused a bond to be purchased on December 13, 2023, with a face value of $1.6 million—$50,000 less than promised. Although this bond shared the same ISIN and CUSIP as the agreed-upon security, the trade confirmations provided by Madison and Megtor indicated it paid a 3.5% interest rate and matured in 2028, not 2024.

192.    Account statements provided by Madison at a later date reflected the purchase of the MTN with a 6.25% interest rate, $1.6 million face value, and a maturity date of December 31, 2024.

193.    Megtor and Madison did not even purport to transfer a bond to Plaintiffs for months, during which time they retained the first $50,000 coupon payment, falsely claimed the bond was "seasoning," and instructed Plaintiffs not to contact the broker for fear of "compliance issues."

194.    When, in Spring 2024, Plaintiffs ultimately raised concerns about the interest rate and maturity discrepancy on the original trade confirmations Madison had provided, Madison created and sent falsified trade confirmations purporting to reflect bond terms of a 6.25% interest rate, $1.6 million face value, and a maturity date of December 31, 2024. Metadata analysis confirmed these documents were fabricated and not issued by any legitimate broker.

195.    Moreover, when the MTN matured on December 31, 2024, it was removed from Odysseus's brokerage account without repayment of principal. As Truva, the trustee, confirmed,

Plaintiffs were never listed on the bondholder register, reflecting that the security was never validly transferred and that the transaction was structured to prevent Plaintiffs from becoming bona fide holders.

196.    Based on these facts, Plaintiffs seek rescission of the MTN Transfer Agreement due to material breach, failure of consideration, and fraud. Defendants did not deliver the bond promised, and if any transfer took place, it was executed in such a way to ensure that Plaintiffs would not have enforceable rights with respect to the bond.

197.    In the alternative, should rescission be unavailable, Plaintiffs seek damages for breach of contract, including the loss of value from the incorrect bond, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise, and other consequential damages flowing from the failed transfer.

198.    Defendants Megtor Partners and Megtor Advisors are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SIXTH CAUSE OF ACTION

### BREACH OF CONTRACT – EFS/ODYSSEUS AGREEMENT
### (Against Defendants Nepo and EFS)

199.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

200.    On November 30, 2023, Odysseus Ventures LLC and EFS, through Defendant Nepo, executed the EFS/Odysseus Agreement.  Under the agreement, EFS stated its intent to issue a $200 million bond series on the Abu Dhabi Global Market and to provide Plaintiffs access to those proceeds.

201.    In exchange, Odysseus agreed to invest $1.5 million in the MTNs identified as ISIN GB00BNYNFZ53.

202.    Plaintiffs fully performed, but EFS never initiated, structured, or listed the promised $200 million bond series. No steps were taken to fulfill the agreement's core purpose.

203.    The agreement was induced by fraudulent misrepresentations concerning EFS's capabilities, intentions, and the role of Bedford Row Capital, and by failure to disclose the promissory note executed by EFS shortly thereafter using the investment proceeds.

204.    As a result, Plaintiffs seek rescission of the EFS/Odysseus Agreement for material breach, fraudulent inducement, and failure of consideration. Rescission is necessary to unwind the agreement and restore the parties to their prior positions.

205.    In the alternative, should rescission be unavailable, Plaintiffs seek damages for breach of contract, including the loss of their $1.5 million investment, lost capital access, unpaid interest, out-of-pocket losses incurred in reliance on EFS's false promises, and other consequential damages flowing from the failed transfer.

206.    Defendants Nepo and EFS breached the EFS/Odysseus Agreement and caused Plaintiffs to suffer damages, including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

207.    Defendants Nepo and EFS are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SEVENTH CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendants Madison, Megtor, Nepo, and EFS)

208.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

209.    In the alternative to Plaintiffs' breach of contract claims, and to the extent that any contract is deemed unenforceable, Plaintiffs assert breach of the implied covenant of good faith and fair dealing.

210.    Madison, Megtor, Nepo, and EFS owed Plaintiffs a duty to act in good faith and not to deprive them of the benefits of their bargain.

211.    Defendants acted in bad faith by misrepresenting the security purchased, diverting funds for unauthorized purposes, delaying the bond transfer, and issuing falsified trade confirmations.

212.    These actions interfered with Plaintiffs' rights under the agreements and rendered performance impossible or meaningless.

213.    As a result, Plaintiffs suffered damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

214.    Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action

## EIGTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
**(Against Defendants Madison, Megtor Partners, and Megtor Advisors)**

215.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

216.    Madison and Megtor, acting as advisors and arrangers for Plaintiffs' investment, undertook fiduciary obligations to act in Plaintiffs' best interest, safeguard their funds, and avoid self-dealing.

217.    Plaintiffs reposed trust and confidence in Madison and Megtor in connection with the structuring and placement of the MTN investment.

218.    Madison and Megtor breached these fiduciary duties by misappropriating funds and issuing fabricated trade confirmations.

219.    As a result, Plaintiffs suffered damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

220.    Defendants Madison, Megtor Partners, and Megtor Advisors are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## NINTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
**(Against Defendant Lustig)**

221.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

222.    As a licensed attorney controlling an IOTA trust account, Defendant Roy R. Lustig owed fiduciary duties to the beneficial owners of any funds he received and held in trust—including duties of loyalty, candor, and care.

223.    Upon information and belief, Lustig accepted funds derived from Plaintiffs' investment and held those funds in his attorney escrow account, despite not having any relationship with or consent from Plaintiffs, and despite knowing that the funds were being used in a manner inconsistent with what was represented to the investors.

224.    Upon information and belief, Lustig failed to confirm the identity of the true owners or intended beneficiaries of the funds before accepting them into his trust account, and failed to take reasonable steps to safeguard the funds against misuse.

225.    Upon information and belief, Lustig further breached his fiduciary duties by facilitating a transaction—the $2.4 million loan from MTN Funding PLC to EFS—using Plaintiffs' funds without disclosure, authorization, or compliance with legal or ethical obligations.

226.    Upon information and belief, rather than applying the funds in a manner consistent with the business purpose of the investment, Lustig directed the funds to repay a $1.5 million personal loan that his company, First City Funding LLC, previously issued to Nepo for the purchase of a luxury condominium.

227.    By knowingly diverting and retaining funds meant for a business transaction, Lustig breached his fiduciary duties as escrow holder.

228.    As a result, Plaintiffs suffered damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

229.    Defendant Lustig is therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## TENTH CAUSE OF ACTION

### AIDING AND ABETTING FRAUD
### (Against Defendant Lustig)

230.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

231.    Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS committed fraud by inducing Plaintiffs to invest $1.5 million in medium-term notes (MTNs) under false pretenses.  They misrepresented the nature, security, and performance of the bond; concealed the substitution of a different security; and diverted proceeds for unrelated purposes.

232.    In the course of investigating the disposition of their funds, Plaintiffs obtained a copy of a $2.4 million unsecured promissory note executed by EFS in favor of MTN Funding PLC, dated December 14, 2023—just two weeks after Plaintiffs wired their funds, and only one day after Megtor purported to use those funds to execute a bond purchase from MTN Funding PLC through Megtor's Trade Bridge brokerage account.  The note had never been disclosed to Plaintiffs by any Defendant.

233.    The note listed the recipient of all loan proceeds as the trust account of attorney Roy R. Lustig and identified Lustig's IOTA account by routing and account number.  Plaintiffs never authorized Lustig to receive, hold, or disburse their funds and were unaware of his involvement until months later.

234.    Upon information and belief, Lustig disbursed Plaintiffs' funds from his trust account to satisfy a pre-existing, unrelated debt incurred by Nepo and EFS, and not in connection

with the MTN investment Plaintiffs were promised.

235.    These actions materially assisted the fraudulent scheme.    By acting as the designated custodian of the diverted funds—and processing the payment without any inquiry or disclosure to the investors—Lustig enabled the Defendants to conceal the diversion, complete the transaction, and misappropriate the proceeds.

236.    As a licensed attorney managing client funds, Lustig was in a position to recognize the inconsistencies and conflicts in the use of investor funds.

237.    As a result, Plaintiffs suffered damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

238.    Defendant Lustig is therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### ELEVENTH CAUSE OF ACTION

**CONVERSION**
**(Against Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS)**

239.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

240.    Plaintiffs had a possessory interest in the $1.5 million transferred in December 2023 for the purchase of a specific MTN, based on Defendants' representations and contractual commitments that Plaintiffs would acquire the MTN Funding PLC bond with ISIN GB00BNYNFZ53, bearing a 6.25% interest rate, $1.65 million face value, and December 2024 maturity.

241.    Defendants Madison, Megtor, Nepo, and EFS intentionally exercised unauthorized dominion and control over those funds by failing to deliver the promised security, and by instead structuring a transaction that diverted the proceeds to fund an undisclosed $2.4 million promissory note from EFS to MTN Funding PLC—executed just days after the wire transfer—with repayment directed to the trust account of Defendant Lustig.

242.    To conceal the misappropriation, Defendants procured a substitute bond with materially different terms and falsely represented to Plaintiffs that it was equivalent to the contracted security. They later attempted to paper over the discrepancies with falsified trade confirmations created by Madison in May 2024.

243.    Madison and Megtor further exercised dominion over proceeds to which Plaintiffs were entitled, including retaining the January 2024 $50,000 coupon payment for themselves, despite representing that Plaintiffs had acquired ownership of the MTN.

244.    Defendants' retention of funds and failure to return Plaintiffs' investment constitutes an unlawful taking inconsistent with Plaintiffs' ownership rights.

245.    As a result, Plaintiffs suffered damages including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

246.    Defendants Madison, Megtor Partners, Megtor Advisors, Nepo, and EFS are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## **TWELFTH CAUSE OF ACTION**

### **UNJUST ENRICHMENT**
### **(Against All Defendants)**

247.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

248.    Defendants received and retained the benefit of Plaintiffs' $1.5 million investment under circumstances that make their retention of those funds inequitable.

249.    Madison and Megtor benefitted from the use of Plaintiffs' funds, retained interest proceeds, and failed to transfer the correct security.

250.    Nepo and EFS benefitted from the promissory note and used the proceeds to pay down personal obligations.

251.    Upon information and belief, Lustig received funds through his IOTA trust account that were used to satisfy a $1.5 million loan to Nepo, despite knowing those funds were part of a fraudulent transaction.

252.    Defendants' retention of these benefits without providing the promised value constitutes unjust enrichment.

253.    Plaintiffs are entitled to restitution and disgorgement of all funds unjustly retained.

254.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## THIRTEENTH CAUSE OF ACTION

### CIVIL CONSPIRACY
### (Against All Defendants)

255.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

256.    Defendants Madison, Megtor, Nepo, EFS, and Lustig knowingly entered into an agreement or understanding to participate in a fraudulent scheme designed to induce Plaintiffs to invest and then misappropriate their funds.

257.    Each Defendant performed one or more overt acts in furtherance of the conspiracy, including but not limited to: making false statements (Madison and Nepo), fabricating trade confirmations (Madison), misdirecting interest payments (Madison and Megtor), executing and concealing an undisclosed promissory note (EFS and Nepo), and, upon information and belief, routing payments through a trust account and using them to repay a prior personal loan (Lustig).

258.    Each Defendant acted with the intent to defraud Plaintiffs and aided the concealment and execution of the scheme.

259.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered substantial financial harm, including the loss of their $1.5 million investment, unpaid coupon payments, unpaid interest, the loss of the interest payments that Plaintiffs have paid on the loan they took out in reliance on Defendants' misrepresentations in order to facilitate the transaction, and loss of access to the promised capital raise.

260.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants jointly and severally and in favor of Plaintiffs for:

(a)    Compensatory damages in an amount to be determined at trial, including but not limited to the loss of Plaintiffs' $1.5 million investment, the remaining par value on the MTN, unpaid coupon payments, interest paid on financing undertaken in reliance on Defendants' misrepresentations, lost access to promised capital, and other consequential and out-of-pocket losses;

(b)    Punitive damages in an amount to be determined at trial, based on Defendants' willful, fraudulent, or recklessly indifferent conduct;

(c)    Rescission of the MTN Transfer Agreement and the EFS/Odysseus Agreement, and restitution of all consideration paid under those agreements, including any accrued interest and amounts necessary to restore Plaintiffs to their pre-transaction position, along with reasonable attorneys' fees and costs incurred in connection with these agreements;

(d)    In the alternative to rescission, damages for breach of the MTN Transfer Agreement and the EFS/Odysseus Agreement, including the full $1.5 million investment amount, the remaining par value on the MTN, unpaid coupon payments, unpaid interest, loan interest costs incurred to finance the investment, lost access to the anticipated capital raise, out-of-pocket expenses, and all other consequential damages flowing from the failure to perform under the agreements, along with reasonable attorneys' fees and costs;

(e)    Damages for breach of the Guarantee, including the guaranteed payment of $109,375 and all additional losses covered by the Guarantee, including Plaintiffs' $1.5 million investment, the remaining par value on the MTN, unpaid interest, missed coupon payments, loan-related costs, and lost access to capital, along with reasonable attorneys' fees and costs incurred in enforcing the Guarantee;

(f)    Disgorgement and restitution of all funds and benefits unjustly retained by Defendants as a result of their wrongful conduct;

(g)    Pre-judgment and post-judgment interest as permitted by law;

(h)    Reasonable attorneys' fees and costs incurred in connection with this action; and

(i)      Such other and further relief as the Court may deem just and proper.

Dated: April 14, 2025
          New York, New York

**SEIDEN LAW LLP**

 /s/ Lauren Elliot            
Amiad Kushner
Lauren Elliot
Thomas Mott
322 Eighth Ave, Suite 1200
New York, NY 10001
646-766-1914
akushner@seidenlaw.com
lelliot@seidenlaw.com
tmott@seidenlaw.com

*Attorneys for Plaintiffs*
