UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ODYSSEUS VENTURES LLC, et al.,

Plaintiffs,

v.

SCOTT MADISON, et al.,

Defendants.
---------------------------------------------------------------X

**MEMORANDUM AND ORDER**
25-CV-2074-SJB-SIL

**BULSARA, United States District Judge:**

Plaintiffs Odysseus Ventures LLC, Grant Denham, and Duncan Penn (collectively, "Plaintiffs") allege that they were victims of an investment fraud scheme orchestrated by Defendants, resulting in the loss of $ 1.5 million. The Defendants include three limited liability companies: Megtor Capital Advisors LLC, Megtor Capital Partners LLC, and Energy Funding Solutions LLC ("EFS"), and three individuals: Scott Madison ("Madison"), David Nepo ("Nepo"), and Roy Lustig ("Lustig"). Defendants EFS, Nepo, and Lustig, none of whom are citizens of New York, move to dismiss the claims and cross-claims against them for lack of personal jurisdiction under Rule 12(b)(2) and Rule 12(c). For the reasons explained below, the motion is granted as to Lustig but denied as to EFS and Nepo.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 26, 2023, Plaintiffs had their first discussion with Madison regarding a potential investment opportunity. (Compl. dated Apr. 14, 2025, Dkt. No. 1 ¶¶ 19–20). During the conversation, Madison held himself out as an authorized agent of Megtor Capital Partners LLC and Megtor Capital Advisors LLC (collectively, "Megtor")—

limited liability companies incorporated in New York and operated from Wainscott, New York, where Madison resides. (*Id.* ¶¶ 7, 13–15, 19).

Plaintiffs told Madison they were searching for financing for real estate investments, and Madison proposed a two-part investment structure he claimed would ultimately allow Plaintiffs to access between $ 20 million and $ 200 million in financing. (*Id.* ¶¶ 20–21). As the first step, Plaintiffs would purchase a medium-term note (the "MTN")— which Madison said had a par value of $ 1.65 million—from MTN Funding PLC for $ 1.5 million, at a 9% discount and secure $ 150,000 in profit at purchase, which would be realized at maturity. (*Id.* ¶ 22). During this conversation, Madison emphasized that the MTN was "100% secured, backed by stable energy assets, and guaranteed to return principal and 6.25% annual interest—even in the worst-case scenario." (*Id.* ¶ 25 (quotation omitted)). He told Plaintiffs that purchasing the MTN was necessary to build a relationship with Bedford Row Capital—the MTN's structurer—and EFS, which would later issue Plaintiffs a larger bond. (*Id.* ¶ 24). As the second step, Nepo, the head of EFS, would lead a larger bond issuance structured through Bedford Row Capital to fund Plaintiffs' projects. (Compl. ¶¶ 24, 26). Nepo resides in Florida, where EFS maintains its principal place of business. (*Id.* ¶¶ 16–17).

Madison arranged a Zoom meeting with Plaintiffs and Nepo to explain the structure and next steps in more detail. (*Id.* ¶¶ 27–28). At the meeting, Nepo told Plaintiffs he was the managing member and an authorized agent of EFS, and had worked extensively with Bedford Row Capital during his 20 years working in international bond markets. (*Id.* ¶¶ 28–29). Nepo explained that if Plaintiffs purchased

the MTN, he would use it as the foundation to sponsor and distribute a much larger $ 200 million bond issuance on the Abu Dhabi Global Market. (*Id.* ¶¶ 30–32). This larger bond issuance would be structured by Bedford Row, issued by EFS, and sold through Nepo's global network of institutional buyers. (*Id.*). Nepo told Plaintiffs that their purchase of the MTN would benefit Bedford Row Capital, which needed the MTN off its books, and clear the way for EFS to structure and issue a new bond series that would provide financing Plaintiffs were seeking. (Compl. ¶¶ 30–31).

On November 1, 2023, Plaintiffs, Madison, and Nepo met again on Zoom. (*Id.* ¶ 36). Nepo again represented that the MTN was secure, and told Plaintiffs that their investment would ultimately lead to access to $ 20 million to $ 200 million through the larger bond issuance. (*Id.*). Plaintiffs, Madison, and Nepo met again via Zoom on November 3, 2023. (*Id.* ¶ 37). Madison and Nepo again assured Plaintiffs that the MTN was secured, backed by stable energy securities, and backed by a large bond series that had never defaulted over the course of several years. (*Id.*). Plaintiffs, Nepo, and Madison met via Zoom again on November 15, 2023 and November 27, 2023, and Nepo and Madison made these same representations to Plaintiffs regarding the security of the MTN, and Plaintiffs' ultimate ability to access $ 20 million to $ 200 million. (*Id.* ¶¶ 38–42).

Based on Madison and Nepo's representations, again repeated and reinforced in documents and Zoom meetings over the following weeks, Plaintiffs agreed to proceed with the MTN purchase. (Compl. ¶ 44). As part of the MTN transaction, Plaintiffs executed three agreements. (*Id.* ¶¶ 49, 59, 73). First, on November 29, 2023, Plaintiffs,

Madison, and Megtor executed a document titled "Personal Guarantee and Corporate Guarantee"—which provided that if EFS failed to raise at least $ 2 million by selling additional MTN bonds under the same series, Madison and Megtor as guarantors would be required to compensate Plaintiff Odysseus Ventures LLC ("Odysseus") either by delivering the MTN and its associated coupon payments or paying a cash equivalent of $ 109,375. (*Id.* ¶¶ 49–51). Second, on November 30, 2023, Megtor entered an MTN Transfer Agreement with Odysseus—through which Megtor pledged to transfer the entirety of the MTN to Odysseus. (*Id.* ¶¶ 59–61). Third, Odysseus entered into an agreement with EFS outlining a broader transaction. (*Id.* ¶ 73). This agreement stated that EFS intended to issue a new bond series through the MTN Capital Bond Program, one listed on the Abu Dhabi Global Markets Stock Exchange, based on specifications to be developed jointly with Odysseus. (*Id.* ¶ 74). In consideration for EFS issuing the new bond series and waiving certain fees, Odysseus agreed to purchase the MTN. (Compl. ¶ 75).

On November 30, 2023, at Madison and Nepo's urging, Plaintiffs secured a $ 1.5 million loan to purchase the MTN. (*Id.* ¶ 78). On December 1, 2023, pursuant to Madison's instructions, Plaintiffs' lender wired $ 1.5 million to Megtor Partners' Interactive Brokers account, which Madison controlled. (*Id.* ¶ 84). Madison represented that Plaintiffs' funds would be used to purchase a specific bond: MTN Funding PLC, 6.25% interest, due December 31, 2024, with ISIN GB00BNYNFZ53. (*Id.* ¶ 85). On December 4 and 5, 2023, Madison submitted trade instructions to Interactive Brokers to place an order to buy the bond, but the trade was never executed. (*Id.* ¶¶ 87–88).

Madison told Plaintiffs Interactive Brokers was uncooperative, and he would need to use a different platform to complete the purchase. (*Id.* ¶ 89). He then instructed Plaintiffs to open a new brokerage account with Trade Bridge Capital, a lesser-known broker. (Compl. ¶¶ 89–90). Ultimately, Madison purchased a security with different terms—MTN Funding PLC, 3.5% interest, maturing October 22, 2028, with a face value of $ 1.6 million—through Trade Bridge. (*Id.* ¶¶ 92–93). Plaintiffs were never informed of this change, and believed Madison and Megtor purchased the original MTN with 6.25% interest, maturing in 2024, with a face value of $ 1.65 million. (*Id.* ¶ 94).

After the substitute bond was purchased, Madison did not transfer it to Plaintiffs. (*Id.* ¶ 95). Plaintiffs asked Madison to complete the transfer of the bond to Odysseus on December 28, 2023. (*Id.* ¶¶ 97–98). Plaintiffs and Madison then went back and forth regarding the transfer of the MTN to Odysseus for months. (*See id.* ¶¶ 99–105). Eventually, on March 20, 2024, Megtor purported to transfer the MTN to Odysseus. (Compl. ¶ 105). After repeated inquiries from Plaintiffs, Madison sent Plaintiffs two amended trade confirmations on May 7, 2024, purporting to reflect the agreed upon 6.25% interest and 2024 maturity. (*Id.* ¶ 106). But it turned out these documents were not authentic, and were created by Madison himself. (*Id.* ¶ 107). In June 2024, when Plaintiffs contacted the Trustee for the MTN series to confirm their ownership, the Trustee advised that Odysseus did not appear as a legal holder on the bond register maintained by Avenir, the official registrar. (*Id.* ¶ 108). Eventually, when the MTN reached maturity on December 31, 2024, Plaintiffs did not receive the final coupon payment or any return of their principal, and on January 31, 2025, the MTN was

removed from Odysseus's brokerage account. (*Id.* ¶¶ 113–14). Plaintiffs allege that the removal of the bond indicates it was paid off at maturity—but that repayment was made to parties other than Plaintiffs. (*Id.* ¶ 115).

While investigating their claims, Plaintiffs discovered that on December 14, 2023—the day after Madison executed an order for an MTN using Plaintiffs' funds—a $ 2.4 million promissory note was executed by EFS in favor of MTN Funding PLC (the "EFS-MTN Note"). (*See* Compl. ¶¶ 93, 120). Pursuant to the Note, MTN Funding made $ 2.4 million available to EFS on the date of the note, and EFS agreed to repay that amount with 7.25% annual interest. (*Id.* ¶ 121). Based on the timing of the note's execution, Plaintiffs allege that their investment was not used to purchase an MTN for their benefit, but was instead redirected to facilitate the $ 2.4 million EFS-MTN Note. (*Id.* ¶¶ 122–27). The Note identifies the attorney account of Lustig, Nepo's attorney, as the designated payee account to accept the funds on behalf of EFS. (*Id.* ¶ 125). Ultimately, the EFS-MTN Note proceeds were distributed as follows: $ 190,000 to Norman Nepo, $ 816,795.13 to EFS and Nepo, $ 301,822.60 to Megtor Capital Partners, $ 106,515.25 to First City Funding Group LLC (an LLC owned by Lustig), and $ 10,467.22 to Lustig for legal fees. (EFS & Nepo Resp. to Interrogs., attached to Decl. of Thomas L. Mott as Ex. 2, Dkt. No. 48-7 at 5–6; Compl. ¶ 226).[1]

[1] "In deciding a motion to dismiss a complaint for lack of personal jurisdiction, the district court may consider materials outside the pleadings, including affidavits and other written materials." *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 276 (2d Cir. 2024) (quotation omitted). Accordingly, the Court considers the additional documents submitted by the parties, including EFS, Nepo, and Lustig's interrogatory responses and declarations, in resolving the motion.

Plaintiffs assert claims for violation of the Securities Exchange Act ("SEA") § 10(b) and Rule 10b-5, common law fraud, fraudulent inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting fraud, conversion, unjust enrichment, and civil conspiracy. (Compl. ¶¶ 147–260). In addition, Madison and Megtor assert a cross-claim against EFS and Nepo for indemnification and contribution. (Megtor Defs.' Answer & Cross-cls. dated July 11, 2025, Dkt. No. 26 at 30–31).[2] EFS, Nepo, and Lustig seek to dismiss Plaintiffs' claims and the Megtor Defendants' cross-claim for lack of personal jurisdiction. (Defs.' Mot. to Dismiss dated Oct. 30, 2025, Dkt. No. 48-4).

DISCUSSION

The principle that "a district court must generally resolve material factual disputes and establish that it has federal constitutional jurisdiction . . . before deciding a case on the merits . . . applie[s] equally to personal jurisdiction, because '[p]ersonal jurisdiction, too, is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication.'" *Mones v. Com. Bank of Kuwait, S.A.K.*, 204 F. App'x 988, 989 (2d Cir. 2006) (quoting *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584 (1999)). "Apart from cases in which Congress has authorized nationwide service of process in connection with a federal claim . . . , a properly served . . . defendant may be subject to two types of personal jurisdiction: specific (or 'case-linked') jurisdiction, which requires that the plaintiff's cause of action . . . arise[ ]

[2] Madison and Megtor also asserted this cross-claim against Lustig, but they stipulated to dismissal on September 11, 2025. (Stipulation of Partial Voluntary Dismissal, Dkt. No. 34).

out of the defendant's activities in a state, or general (or 'all-purpose') jurisdiction, which permits a court to adjudicate any cause of action against the defendant." *Provencher v. Bimbo Foods Bakeries Distrib. LLC*, 175 F.4th 180, 185 (2d Cir. 2026) (quotation omitted).

"[G]eneral jurisdiction exists only when a corporation's contacts with a state are 'so continuous and systematic as to render it essentially at home in the forum state.'" *Sonera Holding B.V. v. Çukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (cleaned up). This occurs when, for example, the defendant is domiciled in the forum state. *See Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014) ("'[G]eneral' or 'all purpose' jurisdiction . . . permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.*, domicile)."). "'Specific' or 'case-linked' jurisdiction depends on an affiliation between the forum and the underlying controversy (*i.e.*, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation)." *Id.* (quotations and alterations omitted).

"Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (quotation omitted). "Where . . . plaintiffs are relying on specific jurisdiction, they must

make the requisite showing with respect to each claim asserted." *Provencher*, 175 F.4th at 185 (quotation omitted).

"[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010) (quotations omitted). While courts will construe the pleadings and supporting materials in the light most favorable to the plaintiffs, resolving all doubts in their favor, plaintiffs must make "'legally sufficient allegations of jurisdiction,' including 'an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'" *Id.* at 35 (quoting *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003)).

**I. Securities Exchange Act**

As an initial matter, no party acknowledges that this is a federal question case, in which "federal courts apply the forum state's personal jurisdiction rules *if the applicable federal statute does not provide for national service of process*." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (emphasis added); *see also Provencher*, 175 F.4th at 186 (noting that if a federal statute specifically authorizes service of process, such service establishes personal jurisdiction); 4A Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1075 (4th ed. 2026) ("When personal jurisdiction in federal court is based on Rule 4(k)(1)(C) . . . , federal law governs exclusively. Rule 4(k)(1)(C) allows federal courts to exercise personal jurisdiction when authorized by a federal statute, which will be a question of federal law."). It is well-established that "[S]ection 27 of the Securities Exchange Act of 1934 authorizes nationwide service of

process." *NLRB v. Universal Smart Conts., LLC*, 166 F.4th 304, 315 (2d Cir. 2026); *see also Mariash v. Morrill*, 496 F.2d 1138, 1142 (2d Cir. 1974) (citing 15 U.S.C. § 78aa). As such, "Section 27 confers personal jurisdiction over a defendant who is served anywhere within the United States." *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991).

Where a "federal statute authorizing nationwide service of process supplies the basis for personal jurisdiction," "[i]t is not the State of New York but the United States which would exercise its jurisdiction over [defendants]." *Universal Smart Conts., LLC*, 166 F.4th at 315 (quoting *Mariash*, 496 F.2d at 1143). Accordingly, a defendant's "contacts with the forum state play no magical role in the due process analysis"— "where . . . the defendants reside within the territorial boundaries of the United States, the minimal contacts, required to justify the federal government's exercise of power over them, are present." *Id.* (quotations omitted).[3]

[3] In *Fuld v. Palestine Liberation Org.*, the Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment" because "the State and Federal Governments occupy categorically different sovereign spheres." 606 U.S. 1, 16 (2025). Accordingly, "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* Nonetheless, the Second Circuit has still deemed contacts with the United States relevant to the Fifth Amendment inquiry post-*Fuld*, *see Universal Smart Conts., LLC*, 166 F.4th at 315, so the Court applies that framework here.

Plaintiffs bring a claim against Nepo and EFS, but not Lustig, for violation of the SEA § 10(b) and Rule 10b-5. (Compl. ¶¶ 147–60).[4] Nepo and EFS do not contest service of process, so the Court concludes it was proper. *See Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 283 (E.D.N.Y. 2021) ("As the Individual Defendants do not contest the adequacy of service and have participated fully in the proceedings thus far, the Court deems service of process to have been proper as to all of the Individual Defendants[.]"), *aff'd sub nom.*, *Mucha v. Winterkorn*, No. 21-1511, 2022 WL 774877 (2d Cir. Mar. 15, 2022); *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 487–88 (S.D.N.Y. 2011) ("Defendants do not argue that there was a defect in service, so Defendants are subject to the jurisdiction of this Court [pursuant to the Exchange Act] unless an exercise of jurisdiction would violate Defendants' rights under the Due Process Clause."), *aff'd sub nom., Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012).

Nepo resides in Aventura, Florida, and operates EFS as President and CEO from that location, which also serves as EFS's principal place of business. (*See* Decl. of David Nepo, attached to Defs.' Mot. to Dismiss, Dkt. No. 48-1 ¶¶ 3–7). Because Nepo and EFS reside "within the territorial boundaries of the United States, the minimal contacts, required to justify the federal government's exercise of power over them, are present." *Universal Smart Conts., LLC*, 166 F.4th at 315 (quotation omitted); *e.g.*, *Caplan v. Dollinger*,

---

[4] Because Plaintiffs do not assert this claim against Lustig, the SEA provides no basis for the Court to exercise personal jurisdiction over him. Thus, the Court determines personal jurisdiction over Lustig solely by reference to New York's long arm statute. *See infra* pp. 18–19, 23–24.

803 F. Supp. 3d 219, 234 (S.D.N.Y. 2025) (denying motion to dismiss SEA claims for lack of personal jurisdiction where many defendants were "alleged to be citizens of the United States," finding defendants "all but concede[d] minimal contacts with the United States by arguing only that Plaintiffs fail to sufficiently allege that 'Defendants directed conduct within *New York*'"); *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 808 F. Supp. 3d 609, 617 (S.D.N.Y. 2025) ("Because Defendant He resides and works in the United States and does not dispute that he was properly served, the Court finds that he has sufficient minimum contacts with the United States[.]").

Nepo and EFS make only a cursory assertion that exercising personal jurisdiction over them "[a]bsent purposeful, forum-related conduct" would offend due process. (*See* Defs.' Reply in Supp. of Mot. to Dismiss dated Dec. 19, 2025 ("Defs.' Reply"), Dkt. No. 48-12 at 10). To the extent an inquiry into the reasonableness of exercising jurisdiction is still required after *Fuld*, *see* 606 U.S. at 23; *supra* n.3, that inquiry is easily satisfied here. In assessing reasonableness, the court evaluates several factors, including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Fuld*, 606 U.S. at 24 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987)). Nepo and EFS have not alleged any undue burdens they would face litigating in New York, and any minimal burden of occasional travel from Florida to New York is not "so gravely difficult and inconvenient as to render the exercise of personal jurisdiction unreasonable and unfair." *Id.* at 25 (cleaned up); *e.g.*, *Orient Plus Int'l Ltd.*, 808 F. Supp. 3d at 618 (finding the defendant would suffer "little hardship litigating . . . in New York" when he "live[d] and work[ed]

in Chicago"); *see also SEC v. Passos*, 760 F. Supp. 3d 95, 113 (S.D.N.Y. 2024) ("Where, as here, a non-diversity action is brought under a federal law which provides for nationwide service of process, [t]he reasonableness inquiry is largely academic . . . because of the strong federal interests involved." (quotation omitted)). In conclusion, the Court concludes it has personal jurisdiction over Nepo and EFS with respect to the SEA claim.[5]

Nonetheless, the Court declines to exercise pendant personal jurisdiction over the state law claims, *see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018), because the parties have not briefed any of the factors relevant to the exercise of such jurisdiction which is entirely discretionary, *see IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1059 (2d Cir. 1993). But the Court turns to the bases for personal jurisdiction urged by the Plaintiffs for those claims—conspiracy jurisdiction under N.Y. C.P.L.R. § 302(a)(2) and jurisdiction under N.Y. C.P.L.R. § 302(a)(1).

## II. N.Y. C.P.L.R. § 302(a)(2) Conspiracy Jurisdiction

"New York's long-arm statute provides for personal jurisdiction over a non-domiciliary who, *inter alia*, 'commits a tortious act within the state' personally 'or

[5] Although the parties do not address jurisdiction pursuant to the SEA in their briefing, the Court cannot ignore the requirement to apply federal law in assessing personal jurisdiction over the SEA claim in this case. *See Sunward Elecs., Inc.*, 362 F.3d at 22; *Marsh v. Kitchen*, 480 F.2d 1270, 1273 n.8 (2d Cir. 1973) ("Although the parties have not raised the issue before us, since it is a jurisdictional matter we have considered whether federal law might authorize the district court to exercise personal jurisdiction over appellees."); *cf.* 4 Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1068.1 (4th ed. 2026) ("[W]hen Congress has undertaken to enact a nationwide service statute applicable to a certain class of disputes, that statute should be afforded substantial weight as a legislative articulation of federal social policy.").

through an agent.'" *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023) (quoting N.Y. C.P.L.R. § 302(a)(2)).[6] "New York law defines 'agent' broadly for purposes of personal jurisdiction," and thus an "agent" may include "not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators." *Id.* at 125–26. To establish personal jurisdiction over a co-conspirator under § 302(a)(2):

> a plaintiff must allege: first, that the defendant was "a part of a conspiracy involving . . . overt . . . acts in New York," and, second, that: "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, *or* at the request of or on behalf of the out-of-state defendant."

*Id.* at 126 (first quoting *Lawati v. Montague Morgan Slade Ltd.*, 102 A.D.3d 427, 428 (1st Dep't 2013); then quoting *Berkshire Bank v. Lloyds Banking Grp.*, No. 20-1987, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022)). The last requirement—"that the New York-based co-conspirators acted at the direction or under the control of the out-of-state defendant—may be satisfied by an allegation that the out-of-state defendant was 'aware of the torts being committed by' co-conspirators in New York." *Id.* at 127 (quoting

[6] Unlike several other states, "[t]he New York long-arm statute does not extend in all respects to the constitutional limits established by *International Shoe Co. v. Washington*, and its progeny." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60–61 (2d Cir. 2012) (citation omitted); *see Banco Ambrosiano v. Artoc Bank & Tr. Ltd.*, 62 N.Y.2d 65, 71 (1984) ("[I]n setting forth certain categories of bases for long-arm jurisdiction, CPLR 302 does not go as far as is constitutionally permissible. Thus, a situation can occur in which the necessary contacts to satisfy due process are present, but in personam jurisdiction will not be obtained in this State because the statute does not authorize it." (citations omitted)). Therefore, courts first consider whether the requirements of New York's long-arm statute have been satisfied, before addressing whether the exercise of personal jurisdiction would comport with due process. *Peterson v. Bank Markazi*, 121 F.4th 983, 1002 (2d Cir. 2024).

*Berkshire Bank*, 2022 WL 569819, at *3). Put differently, "there is no requirement that a plaintiff demonstrate that a defendant 'directed, controlled, and/or supervised the co-conspirator who carried out the overt acts in the forum.'" *Berkshire Bank*, 2022 WL 569819, at *2 (quoting *Schwab Short-Term Bond Mkt. Fund*, 22 F.4th at 124).

**A. Conduct in Furtherance of an Alleged Conspiracy**

EFS, Nepo, and Lustig do not argue that Plaintiffs failed to adequately allege conspiracy, and the Court finds Plaintiffs have sufficiently alleged that each Defendant was "a part of a conspiracy involving . . . overt . . . acts in New York." *See Fat Brands Inc.*, 75 F.4th at 126. The Complaint alleges that EFS, Nepo, and Lustig entered into an agreement or understanding with New York co-conspirators (including Madison) to defraud Plaintiffs by inducing their investment and then misappropriating Plaintiffs' funds for their own benefit, (Compl. ¶¶ 256–57); it identifies several overt acts in furtherance of that conspiracy—including acts taken by Madison in New York, (*see id.* ¶¶ 8, 257); and it details Plaintiffs' losses, (*id.* ¶ 259).

And the Complaint alleges Nepo, EFS, and Lustig participated in that conspiracy to defraud Plaintiffs. Specifically, Plaintiffs allege that Nepo knowingly made false statements to induce their investment on Zoom calls with Plaintiffs and Madison, that EFS and Nepo executed and concealed a promissory note obtained for their benefit using Plaintiffs' investment funds, and that Lustig routed payments involving Plaintiffs' misappropriated funds through his trust account. (Compl. ¶¶ 30–43, 124–29, 137–48, 151, 155–56, 257). These allegations are sufficient to assert a prima facie claim of conspiracy for purposes of evaluating jurisdiction under § 302(a)(2). *See Fat Brands Inc.*,

75 F.4th at 126; *e.g.*, *Floyd's of Leadville, Inc. v. Alexander Cap., LP*, No. 22-CV-3318, 2023 WL 6198666, at *6 (S.D.N.Y. Sep. 22, 2023) (finding sufficient allegations where conspiracy "was allegedly spearheaded by a New-York based investment firm" and foreign defendant created an investment deck, proposed a plan to create a new company that would play an essential role in the conspiracy, and contacted investors to discuss reassignment of their investments to the new company).

**B. Awareness**

**i. Nepo and EFS**

Nepo and EFS contend that Plaintiffs have not alleged that they "had an awareness of the effects in New York of [their co-conspirator's] activity," (Defs.' Reply at 7 (quoting *Fat Brands, Inc.*, 75 F.4th at 126)). They argue the Complaint does not specifically allege that "Nepo—the only Nepo Defendant allegedly on the Zoom calls—knew that Madison took the calls from New York or that he worked or resided in New York." (*Id.* at 7). In essence, Nepo and EFS contend that Plaintiffs' conspiracy jurisdiction theory fails because they were "blindsided by [their] co-conspirator's contacts with the forum." (*Id.* at 6 (quoting *Sullivan v. UBS AG*, 149 F.4th 206, 218 (2d Cir. 2025)). But the allegations and evidence permit the inference that Nepo and EFS knew that Madison, who lives in New York, and Megtor, two New York-based LLCs, were operating out of New York. (*See* Compl. ¶¶ 13–15). Nepo and EFS clearly had a business relationship with Madison and Megtor—Madison introduced the Plaintiffs to Nepo, and Nepo and Madison proceeded to jointly solicit the Plaintiffs' investment and outline a multi-step investment proposal, which both Madison and Megtor and Nepo

and EFS would be a part of. (*See* Compl. ¶¶ 26–35, 49, 59, 73). Moreover, after receiving the funds from the EFS-MTN Note, Nepo directed Lustig to transfer $ 301,822.60 to Megtor's New York bank account. (*See* EFS & Nepo Resp. to Interrogs. at 6; Lustig Resp. to Interrogs., attached to Decl. of Thomas L. Mott as Ex. 3, Dkt. No. 48-8 at 3). These allegations are sufficient to infer that Nepo and EFS knew that Madison and Megtor were operating from New York and committing acts in furtherance of their plan from there. *Floyd's of Leadville, Inc.*, 2023 WL 6198666, at *6 ("FOL's allegations that Clapham 'agreed to do business with New York-based' Alexander Capital and that 'he was deeply involved in the New York-based fraud' orchestrated by Alexander Capital permit the Court to infer that Clapham 'was aware of the impact of his conduct in New York.'" (quoting *Fat Brands Inc.*, 75 F.4th at 127)).

And critically, Nepo and EFS offer no evidence that they were unaware that Madison and Megtor were operating from New York. While counsel argues that Nepo and EFS did not know Madison and Megtor were located in New York, (*see* Defs.' Reply at 10), arguments by counsel are not evidence, *see Griffin v. Sheeran*, 767 F. App'x 129, 133 (2d Cir. 2019) ("[A]n attorney's unsworn statements in a brief are not evidence."). Unlike Lustig, who avers in his sworn interrogatory responses that he "had no relationship with or interactions with Megtor or Scott Madison" other than sending one email at Nepo's direction, and that he "had no understanding of . . . their place(s) of business," (Lustig Resp. to Interrogs at 4), Nepo's sworn declaration and Nepo and EFS's interrogatory responses are devoid of any allegation or evidence that EFS and Nepo did not know Madison and Megtor were operating from New York. In the

absence of any evidence to the contrary, the Court finds Plaintiffs' allegations sufficient to establish that Nepo and EFS knew of Madison and Megtor's presence in New York and their New York contacts—and therefore had an awareness of the effects of their conduct in New York.

**ii. Lustig**

As for Lustig, however, Plaintiffs have not set forth sufficient facts to establish his awareness of Madison or Megtor's activity in New York. Plaintiffs allege only that the EFS-MTN Note was to be paid to Lustig's attorney trust account, (*see* Compl. ¶ 125), and that Lustig ultimately distributed a portion of the funds from the EFS-MTN Note to Megtor in New York at Nepo's direction, (*see* EFS & Nepo Resp. to Interrogs. at 6; Lustig Resp. to Interrogs. at 3). This is insufficient to establish his awareness of Madison or Megtor's involvement in the purported scheme from New York. In contrast to Nepo, there are no allegations that Lustig ever communicated with the Plaintiffs, that he was involved in the solicitation of their initial investment, or that he communicated with Madison or Megtor on any regular basis. The single time Lustig communicated with Madison or Megtor was on November 20, 2024, when he sent an email to Madison at Nepo's direction regarding wire instructions for funds from Megtor Capital Partners to be sent to his trust account. (Lustig Resp. to Interrogs. at 4). Moreover, unlike EFS and Nepo, Lustig expressly denies any knowledge of Madison and Megtor's business, their "roles in securities or financing transactions," or "their place(s) of business." (*Id.*). On these facts, the Court cannot conclude that Lustig had an awareness of Madison and Megtor's activity in New York. *See, e.g.*, *Chapin Home for the Aging v. McKimm*, No. 11-

CV-0667, 2014 WL 12883697, at *5 (E.D.N.Y. Aug. 7, 2014) (finding no awareness where plaintiff "aver[red] no facts that the Claiborne Defendants played any role in the allegedly fraudulent scheme other than receiving the funds" and failed to allege that they "had awareness or knowledge of the effects of [their co-defendants'] activities in New York"), *report and recommendation adopted*, 2014 WL 4662401 (Sep. 18, 2014); *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 808 (S.D.N.Y. 2017) (finding plaintiffs failed to demonstrate defendant's awareness where "not a single paragraph" in the complaint "expressly connect[ed]" that defendant to the New York activities of his alleged co-conspirator). Accordingly, § 302(a)(2) provides no basis to exercise personal jurisdiction over Lustig.

**C. Benefit & Direction or Control**

EFS and Nepo do not argue that Plaintiffs have failed to meet the second and third requirements to assert conspiracy jurisdiction under § 302(a)(2), and the Court finds Plaintiffs' allegations satisfy these requirements as well. As to the requirement that "the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators," Plaintiffs have set forth sufficient facts to demonstrate that Madison and Megtor's conduct in New York benefitted Nepo and EFS. They allege that Madison and Megtor redirected their initial investment to facilitate the $ 2.4 million EFS-MTN Note, which was later used to make payments to both EFS and Nepo. (*See* Compl. ¶¶ 120–26; EFS & Nepo Resp. to Interrogs. at 5).

As for the third requirement of direction or control, this requirement "may be satisfied by an allegation that the out-of-state defendant was aware of the torts being

committed by co-conspirators in New York." *Fat Brands Inc.*, 75 F.4th at 127 (quotation omitted). Nepo and EFS were plainly aware of Madison's alleged torts in New York—such as fraud and fraudulent inducement—as Nepo participated in calls where Madison made false representations to Plaintiffs to solicit their investment, and Nepo himself made those same false representations. (*See* Compl. ¶¶ 28–44).[7] And the Court has already rejected Nepo and EFS's argument that they had no idea Madison was committing these torts *in New York*. *See supra* pp. 16–18.

**D. Due Process Considerations**

"Due process requires sufficient contacts with the forum state such that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 183 F.4th 78, 95 (2d Cir. 2026) (quoting *Int'l Shoe Co. v. Wash. Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316–17 (1945)). Where the plaintiff invokes specific jurisdiction, "the necessary contacts often go by the name purposeful availment"—"jurisdiction arises when a company exercises the privilege of conducting activities within a state—thus enjoying the benefits and protection of its laws[.]" *Id.* (quotations omitted). In many

[7] Nepo and EFS argue that "there is no allegation that any of the Nepo Defendants knew about Madison's alleged fabrication of trade confirmations, let alone that they were fabricated in New York," and that "[t]here is no allegation that the Nepo Defendants knew that [Plaintiffs' agreements with Megtor] existed, let alone that they were allegedly negotiated and executed in New York." (Defs.' Reply at 7). But these are only some of the overt acts Plaintiffs allege were taken in New York in furtherance of the conspiracy—and there is no requirement that Nepo and EFS be aware of every overt act taken in New York.

cases, the state and federal analyses can be "virtually identical" as "[t]he same facts that support a finding of purposeful availment under state law likewise show that each defendant has 'take[n] some act by which it purposefully avails itself of the privilege of conducting activities within the forum State.'" *Id.* at 96 (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)). Relevant here, where personal jurisdiction is based on an "agent's contacts," the Second Circuit has "never suggested that due process requires something more than New York law." *Charles Schwab Corp.*, 883 F.3d at 85–86.

Having found the requirements of C.P.L.R. § 302(a)(2) satisfied with respect to EFS and Nepo on the basis that they participated in a conspiracy with New York-based co-conspirators Madison and Megtor, knowing Madison and Megtor took acts in furtherance of that conspiracy in New York, EFS and Nepo purposefully availed themselves of the privilege of conducting activities in New York; therefore exercising personal jurisdiction over them, with respect to the conspiracy-related claims, is consistent with due process. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) ("We conclude that assertion of personal jurisdiction over Ubaldelli comports with due process for the same reasons that it satisfies New York's long-arm statute."); *e.g.*, *Floyd's of Leadville, Inc.*, 2023 WL 6198666, at *6–*7 (finding "both the minimum contacts and reasonableness inquiries satisfied" where plaintiff alleged that defendant "participated in the tortious conduct of a conspiracy with New York-based co-conspirators, overt acts of which took place in New York"). To the extent EFS and Nepo contend the exercise of jurisdiction over them would be unreasonable, the Court

has already rejected such arguments in connection with the SEA claim. *See supra* pp. 12–13. Exercising personal jurisdiction over EFS and Nepo therefore does not offend due process.

Although personal jurisdiction is assessed on a claim-by-claim basis, *see Provencher*, 175 F.4th at 185, Nepo and EFS do not engage in that analysis, only generally arguing that Plaintiffs have not satisfied the requirements for conspiracy-based jurisdiction under C.P.L.R. § 302(a)(2). In any event, Plaintiffs' state law claims all arise out of the alleged conspiracy, and C.P.L.R. § 302(a)(2) therefore confers jurisdiction. *See* N.Y. C.P.L.R. § 302(a) (conferring jurisdiction over any "cause of action *arising from* any of the acts enumerated in [C.P.L.R. § 302(a)]" (emphasis added)). And given the exercise of jurisdiction over Nepo and EFS for Plaintiffs' claims, it is appropriate to exercise jurisdiction over the cross-claim asserted against these same Defendants by two other parties (Madison and Megtor), which seeks contribution and indemnity coverage for any recovery made by Plaintiffs on those original claims. *See, e.g.*, *Hui Ye v. Gold Scollar Moshan PLLC*, No. 14-CV-7683, 2015 WL 6619579, at *2 (S.D.N.Y. Oct. 30, 2015) ("Where the defendant is properly before the court on the claims asserted in the complaint, the court may also exercise personal jurisdiction over related cross-claims.").

Because the Court finds § 302(a)(2) confers personal jurisdiction over Nepo and EFS as to the remaining claims, the Court need not decide whether § 302(a)(1) also confers personal jurisdiction over them. Accordingly, the Court proceeds to analyze whether C.P.L.R. § 302(a)(1) provides a basis to exercise personal jurisdiction over Lustig only.

## III. N.Y. C.P.L.R. § 302(a)(1)

"N.Y. C.P.L.R. § 302(a)(1) . . . confers jurisdiction over claims 'arising from' the acts of 'any non-domiciliary . . . who in person or through an agent[ ] transacts any business within the state or contracts anywhere to supply goods or services in the state[.]'" *Northwell Health, Inc.*, 183 F.4th at 92 (quoting N.Y. C.P.L.R. § 302(a)(1)). To find jurisdiction under § 302(a)(1), two elements must be satisfied: (1) the defendant must transact business in New York, and (2) the cause of action must arise from that business transaction. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012). The inquiry is assessed under the totality of circumstances; a single transaction may suffice and the defendant need not be physically present in New York during the subject activity for jurisdiction to exist. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999). Although § 302(a)(1) is a "single act statute" and "proof of one transaction in New York" may be sufficient, the defendant's activities in New York must be "purposeful." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022). "An act is purposeful or intentional if it was undertaken to invoke the 'benefits and protections of [New York's] laws.'" *Northwell Health, Inc.*, 183 F.4th at 92 (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)).

Plaintiffs generally contend that Defendants' "New-York directed activities—joint Zoom solicitations with a co-conspirator, purposeful use of a New York bank account at the core of the scheme, and the knowing routing of Plaintiffs' funds into and out of that account—are precisely the sort of 'purposeful' New York business contacts that satisfy § 302(a)(1)." (Pl.'s Opp'n to Defs.' Mot. to Dismiss dated Dec. 4, 2025, Dkt.

No. 48-9 at 16–17). But Lustig did not participate in all of these alleged activities. Indeed, the only allegations that Lustig "transacted business" in New York are that he wired $ 301,822.60 from his attorney trust account to Megtor, and that he sent one email to Madison regarding wire instructions for funds from Megtor to be sent to his trust account, both at Nepo's direction. (*See* EFS & Nepo Resp. to Interrogs. at 6, 11–12; Lustig Resp. to Interrogs. at 4).

Lustig's single wire transfer and email, both performed at the direction of his client, Nepo, are insufficient to confer jurisdiction under § 302(a)(1). "[A] foreign defendant's communications with a party in New York or sending of monies into New York are not sufficient to establish personal jurisdiction without the defendant having 'projected' himself into New York for the purposes of conducting business there." *Hill v. HSBC Bank*, 207 F. Supp. 3d 333, 339 (S.D.N.Y. 2016) (collecting cases). Lustig's initiation of a wire transfer and sending an email into New York on behalf of his Florida client, Nepo, do not demonstrate that he "purposefully sought to establish a substantial ongoing business relationship" with a New York entity. *See State v. Vayu, Inc.*, 39 N.Y.3d 330, 334 (2023); *cf. Epstein v. Thompson*, No. 09-CV-8696, 2010 WL 3199838, at *3 (S.D.N.Y. Aug. 12, 2010) ("The fact that an attorney's client resides in New York does not mean that the attorney transacts business in New York. Nor do contacts between out-of-state attorneys and New York clients confer jurisdiction over the attorneys, where, as here, the attorneys perform all legal work outside New York." (citations omitted)). Because § 302(a)(1) also provides no basis to exercise personal jurisdiction over Lustig, the Court lacks personal jurisdiction over him.

CONCLUSION

For the reasons explained above, the motion to dismiss for lack of personal jurisdiction is granted in part and denied in part. The Court concludes it lacks personal jurisdiction over Lustig, and dismisses Plaintiffs' claims against him without prejudice. *See Smith v. United States*, 554 F. App'x 30, 32 n.2 (2d Cir. 2013) ("[A] dismissal for want of personal jurisdiction is without prejudice."). However, the Court concludes it has personal jurisdiction over Nepo and EFS with respect to all claims asserted by Plaintiffs, and the cross-claim asserted against them. Judge Locke is respectfully directed to lift the discovery stay and to enter a schedule governing the remainder of pretrial activities in the case.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: September 2, 2026
Central Islip, New York